## JOE TINKER v. STATE.

No. A-408.   Opinion Filed May 2, 1911.

(115 Pac. 475.)

1.   APPEAL—Sufficiency of Evidence.   When issues of fact are properly submitted to a jury by the court, and the testimony in the record tends reasonably to support the finding of the jury, such finding will not be disturbed on appeal.

2.   APPEAL—New Trial—Misconduct of Jury.   When the misconduct of a juror is set up as a ground for a new trial, and proof is heard by the court on the allegation for the defendant and the state, and included in the record, the judgment of the court overruling the motion on such ground will not be disturbed on appeal, when it clearly appears that such juror was guilty of no misconduct prejudicial to the appellant.

(Syllabus by the Court.)

*Appeal from District Court, Harper County; R. H. Loofbourrow, Judge.*

Joe Tinker was convicted of assault with a dangerous weapon, and brings error. Affirmed.

*Chas. Swindall,* for plaintiff in error.
*Smith C. Matson,* Asst. Atty. Gen., for the State.

ARMSTRONG, JUDGE. The indictment in this case charges the plaintiff in error with unlawfully, intentionally, wrongfully, and feloniously attempting to shoot at one E. M. Claycomb with a certain pistol, and with a felonious intent to kill said Claycomb. He was convicted by the jury of assault with a dangerous weapon, with intent to injure said Claycomb, and his punishment fixed at two years in the state penitentiary.

This prosecution grows out of a difficulty which occurred at a dance at the home of John Nickum in Harper county. It appears that E. M. Claycomb and Nickum had arranged to have a dance and had invited certain persons, not including the plaintiff in error, to attend; that plaintiff in error came to the dance more or less intoxicated, and armed with a revolver. The testimony is conflicting as to just what was said and done; the state contending that plaintiff in error threatened to kill Claycomb, drew the pistol, pointed it at, and attempted to shoot, him. Plaintiff in error admits that he drew the pistol, but denied that he attempted to shoot prosecuting witness. The witnesses agree that considerable consternation prevailed while the plaintiff in error was being disarmed. Four chambers of the revolver were loaded; but none of them were discharged in the scuffle. Plaintiff in error was tried at the October term of the Harper county district court, in 1908.

In his petition in error, a number of questions are raised, all of which are abandoned in the brief, except three, one of which is that the verdict of the jury is contrary to the evidence, and is not sustained by the evidence. On this proposition we quote at length from the testimony in the record:

The prosecuting witness, E. M. Claycomb, gave the following testimony:

"Q. Did you have any trouble with him, Mr. Claycomb? A. Yes, sir. Q. You may state what that was. A. Well, what it occurred about? Q. Just state what the trouble was. A. The trouble was that he drew a gun on me, and said that he would kill me. Q. You may state the circumstances, now, of his drawing that gun. What caused him to do it? A. It seemed to be

because he didn't get number one to dance on. Q. Were you selling numbers—dance tickets? Was that number one that you refer to a dance ticket? A. Yes, sir. Q. You say this occurred because he didn't receive number one? A. That's my understanding. Q. What did he say about it, if anything? A. He said if he couldn't get number one, he wouldn't get any. Q. What else did he say? A. At that time that's all he said; but afterwards Mr. Smith taken his sister and went out on the floor to dance, and he objected to her dancing with him. He said if he didn't dance, she couldn't. Q. Just go ahead, Mr. Claycomb, and state what occurred there. A. Well, then I think he went out of the room, and he came back directly, and his sister went to him and caught him around—threw her arms around him, and began to scream that he had a gun; to come and take it away from him; and it seemed that they were rather slow about doing it, and finally I went up and taken the gun away from Tinker. When I went to him— started to him—why, he swore he would 'kill that bald-headed son of a bitch,' and drew the gun, had the gun in his left hand, and raised it about in that position. Q. Pointing the gun at you? A. Yes, sir."

This witness also testified to taking the gun from the plaintiff in error; that it had four chambers loaded; and that he delivered the gun and cartridges to the county attorney.

Witness John W. Nickum gave the following testimony:

"Q. After Mr. Claycomb got the gun, was it loaded? A. Yes, sir. Q. How many cartridges? A. I think three or four; I wouldn't say which. Q. Examine those, and state whether or not they are the shells or cartridges. A. Those look like the same shells. Q. You say you saw that gun in Joe Tinker's hand? A. Yes, sir. Q. What was he doing with it, Mr. Nickum, when you first saw the gun? A. When I first saw the gun, he seemed to be in a little dispute about numbers. I told Tinker, I said, 'If you want a number, Joe, I'll get it for you.' He said, 'I can get my own number.' He said an oath with it. I said, 'Now, they have gathered for a social time. There is no use to have any trouble.' He said, 'You look like 30 cents. You must take me for a spring chicken'—and started to pull the gun out of his pocket. About that time his sister discovered the gun and halloed, 'He has a gun.' Mr. Claycomb came walking in about that time, and he said, 'You bald-headed son of a bitch, I'll get you,' and started

to raise the gun, and his sister grabbed him, and had her arms right around him by that time. Q. Did he snap the gun? A. I couldn't say about that. I wasn't close enough to hear it snap. Q. Did you see the gun pointed toward Mr. Claycomb? A. I saw him raise it up that way. Q. When was that, with reference to the time he made the remark, 'I'll kill the bald-headed son of a bitch?' A. Just about the same time. Q. Was Mr. Claycomb near him when he made that remark? A. I would judge he was about as far as from here to that man. Q. Who was he addressing that remark to? A. I would judge to Mr. Claycomb. Q. Who took the gun from Tinker? A. Mr. Claycomb. Q. Did you help? A. Yes, sir; I had hold of one arm. Q. Did you put Mr. Tinker out of the house? A. Yes, sir; they pushed him out of the house. Q. How long did he remain there after that? A. He was back in the house after that. Q. Was there any further trouble? A. Yes, sir. Q. You may state whether Mr. Tinker was sober or otherwise that evening. A. I thought by his actions he was drinking. Q. What was the commencement of this trouble, Mr. Nickum? A. The first I heard of it was over a number. His sister was on the floor, dancing with a young fellow by the name of Hunter, and he said if he couldn't get a number, why, she couldn't dance; and I went and talked to him and said, 'Come on, Joe, and have a good time, and have a good time with the rest of them,' and the next time was when this gun play came up."

Witness Mrs. Viva Painter gave the following testimony:

"Q. Did you hear Mr. Tinker make an assertion to Mr. Claycomb? A. I heard him cursing him about a number. He wanted a number on the dance, as I understood. Q. State how you heard it stated. A. I can't say. He wanted—it seemed as though he wanted a number of the dance, and he wanted the first number, as I understood it; and he had asked Mr. Claycomb to give him a number, and Mr. Claycomb said he wasn't selling numbers, and then he went outdoors, and when he came in Mr. Claycomb had given out some numbers, and it seems as though it made Mr. Tinker mad. because he didn't get one of the first one, and he forbid his sister dancing, was the first I noticed any trouble, and she wanted to go home, and he wouldn't go home. Q. Did you hear him make any remark directly to Mr. Claycomb? A. Why, yes. Q. State what it was. A. He was cursing, and I couldn't say just to the words what he said, because you know what a woman is when there is any trouble; but he called him a

'bald-headed, Roman-nosed son of a bitch.' Q. You say you weren't close enough to see the gun? A. No; there were some men between us. There was a set dancing between where I sat and where he was. Q. Was there considerable noise there about the time you heard him make those threats? A. Yes, sir."

Witness E. Bates gave the·following testimony:

"Q. Were you present when Mr. Tinker and Mr. Claycomb had an altercation? A. Yes, sir. Q. You may state what you saw there. A. Well, sir, it seems as though there was some controversy over numbers. Mr. Tinker wanted the first number, and Mr. Claycomb wasn't ready to sell numbers when he first came up, and he told him he wasn't, and so Mr. Tinker at this time stepped out. He wasn't there, when Mr. Claycomb began selling numbers, and when he came in Mr. Claycomb' had sold some 10 or 12 numbers —I forget just now which—but Mr. Tinker came to Mr. Claycomb and said something about not getting the first number, and allowed if he didn't have the first number he wouldn't have any, and then he got loud and began to abuse Mr. Claycomb, and said he would 'shoot the bald-headed son of a bitch,' I think it was now, and as he pulled his gun out (he had a gun)—pulled it out of his pocket with his left hand. His sister was hold of him at that time, caught hold of him, and made some remark about getting his gun from him, and Mr. Claycomb during this time had went toward Mr. Tinker to get the gun, and Mr. Kemper was standing beside me, and said, 'Let's get the gun from him,' and Mr. Claycomb stepped forward and took the gun from him. Q. Did you see the gun pointed at any person? A. It was pointed at Mr. Claycomb when he wrenched it up in that form. Q. Was that when he made the remark that he would 'kill the bald-headed son of a bitch'? A. Yes, sir; that's as well as I can remember when he made it. Q. How long was it from the time he made the remark until Claycomb had hold of him? Did he rush up? A. He just walked right up to him. Q. The interval was very short between the time he made that remark and the time Mr. Claycomb seized the gun? A. Yes, sir. Q. Did you hear the snapping of the gun? A. Yes, sir. Q. How many times did it snap? A. I should judge about four or five times, as well as I remember. I know I was looking for it to go off at any time? Q. Did you see the gun at that time? A. I seen it when Claycomb wrenched it from him."

This witness also testified that plaintiff in error acted as if he was intoxicated.

On cross-examination this witness gave the following testimony:

"Q. Now, you had him by the right arm during part of the time, didn't you? A. Yes, sir. Q. You were paying more attention to holding him than you were to how that gun was pointing? A. Yes, sir; I was at that time, because I thought that was my part to hold him. Q. He hadn't made any threat before that to do any one any harm, until Claycomb came up, and he said he would 'shoot the son of a bitch'? You hadn't heard him make any? A. No, sir. Q. His sister had said that he had a gun before that? A. She said it as we walked toward him. Q. That was before he said he would shoot Claycomb? A. No, sir; right at the time. * * * Q. And you didn't hear it until they got to scuffling, and he had the gun turned down that way? A. I never noticed how the gun was turned. Q. You know that he had turned it before the gun snapped? A. Yes, sir; I think he had the gun. I know he had hold of the gun when the snapping was going on."

And on redirect examination the following:

"Q. How long was it from the time his sister said, 'He's got a gun,' or 'Take the gun away from him,' until Mr. Claycomb had advanced and secured the gun? A. Just as quick as Mr. Claycomb could walk to him. Q. And he got the gun soon after that? A. Yes, sir. Q. How long would that be from the time she made that assertion, until Mr. Claycomb had the gun? A. I should judge it would be about a minute, something like that. Q. His sister, you say, had hold of him about that time? A. Yes, sir. Q. Tinker couldn't hold the same position, could he—a steady position—with his sister on his back, trying to hold him? A. No, sir. Q. He was jerking around considerably, wasn't he? A. He certainly was."

Witness August Kemper gave the following testimony:

"Q. Were you present when an altercation between him and Mr. Claycomb took place? A. Yes, sir. Q. State what you saw now of that altercation. A. Well, I seen that Mr. Tinker had raised some disturbance about getting a number for the dance, and I heard him say afterward that he wasn't going to have no number at all then, if they wouldn't give him a number when he

wanted to dance. There was a disturbance raised then, and he seemed to get mad, and we went ahead with the dance, or I was dancing, and I heard some one say, 'He has a gun,' and, of course, that stopped the dance that we was starting, and his sister said, 'He's got a gun. Help me take it away from him.' I said, 'Mr. Bates, let's go over and take that gun away from him. He is liable to shoot somebody,' and Mr. Bates said, 'All right,' and we started; but in the meantime Mr. Claycomb had went on ahead of us, and seemed to be scuffling with him for the gun when we got there. I went up and took hold of Mr. Tinker's right hand, and Mr. Bates also had hold of it, and Mr. Forsythe had hold of him—was behind him, trying to hold his arms down—and his sister was in front of him, and had her arms about his neck."

And on cross-examination the following:

"Q. Claycomb had hold of the barrel, didn't he? A. Not when I seen the gun. Q. Did you hear the gun snap, before Claycomb got hold of it? A. Just about the time he caught hold of the gun or his wrist, or something like that. Q. And had the gun turned from him when it snapped? A. I couldn't say. * * * Q. You never heard but one threat? A. He repeated that a number of times."

Witness Charlie Jenkins testified for the plaintiff in error, on his direct examination, as follows:

"Q. Were you there at the time the difficulty came up between Mr. Tinker and Mr. Claycomb? A. Yes, sir. Q. Did you see where Joe Tinker's hands were during this difficulty? A. I seen where they was part of the time. Q. Where were they when you saw them? How did he have his hands? A. Why, first, he had them in his pockets. Q. What happened after that? A. I was on the floor, ready to dance, and I heard somebody halloing, and I went over to see about it, and him and Mr. Claycomb was scuffling over a gun, and somebody else had hold of Mr. Tinker. Q. Now, did you ever see Mr. Tinker with his gun up before him in a shooting position, at any time? A. No, sir." ˥

And on cross-examination the following:

"Q. When you first heard of this affray, or heard some one swearing or making a noise over there, Mr. Nickum and Mr. Tinker were together? A. Mr. Claycomb and Mr. Tinker. Q. Did you see what happened between Mr. Tinker and Mr. Clay-

comb, before you got there? · A. Not all. * * * Q. Did you see Mr. Claycomb when he first took hold of Mr. Tinker. A. No, sir; I didn't see him when he first grabbed him. Q. Did you see what happened, before he did grab him, between Mr. Tinker and Mr. Claycomb? A. Not all; no. Q. What did you see? A. I seen Mr. Claycomb go over there, and heard them talking. Q. Did you see the position of Mr. Tinker's hands, before he took hold of him? A. No, sir; only one of them. Q. Which one? A. His right one. Q. You don't know what he had in his left hand? A. No, sir. Q. And you don't know what position his left hand was in? A. No, sir. Q. You don't know what he had in it? A. No, sir. Q. Did you hear him make any assertion there in the nature of a threat? A. No, sir. Q. Did you hear everything Tinker said? A. Yes, sir; I expect I heard everything. Q. Did he swear any? A. Yes, sir. Q. Did you hear him make any threat at all against Mr. Claycomb? A. Not before Mr. Claycomb went over there. Q. Did you hear him make any when Mr. Claycomb went over there? A. No, sir. Q. Did you hear him make any assertion like, 'I'll kill the bald-headed son of a bitch'? A. No, sir. Q. If he had made that assertion, you could have heard it, could you? A. I could have heard it. Q. You swear now that he didn't make that assertion? A. I don't swear that he didn't. Q. Did he make any threat toward Mr. Claycomb? A. No, sir."

Witness William Nutter, on behalf of the plaintiff in error, testified as follows on his direct examination:

"Q. Did you see Joe Tinker and Mr. Claycomb on the night of May 1, 1908, at a dance over at Nickum's residence? A. Yes, sir. Q. Were you there at the time the difficulty came up between Mr. Claycomb and Mr. Tinker? A. Yes, sir. Q. Did you see where Tinker's hands were at the time they were scuffling around there? A. No, sir. Q. Didn't notice his hands? A. No, sir."

Witness Eli Landrith, on behalf of the defendant, testified as follows:

"Q. Did you see a little difficulty there between Mr. Claycomb and Mr. Tinker? A. I seen part of it. Q. What part did you see? A. Well, the first I noticed they was in a scuffle was when Joe's sister said for somebody to come and get the gun, and I went back there, and he was standing there in the corner, hold-

ing the gun. Q. Who was that standing in the corner? A. Joe Tinker and Mr. Claycomb. Q. What else did you see? A. I started to help get the gun away from him. Q. Did you get there and help get it away? A. I helped get it away. Joe had it in his left hand, and Mr. Claycomb had hold of his wrist. Q. Show the jury about how he had it. A. (Indicating). He had it right about there, and I come up and grabbed Joe by the wrist, and gave his arm a jerk. Q. What did you do then? A. That kind of broke Claycomb's hold loose, and gave me his hand to work on, and I pulled it up that way, on his knee, and that kind of broke his knuckles loose from the grip on the gun, and Claycomb took the gun. Q. How did he have the gun gripped at that time? A. I didn't notice just how he did have hold of the gun, exactly. Q. Was he trying to hold it? A. It looked like it. Q. It wasn't pointing at anybody at any time you saw it, was it? A. No, sir."

And on cross-examination the following:

"Q. You didn't see them until they had been scuffling over the gun for a while? A. No, sir. Q. You don't know what happened before that? A. No, sir. Q. You don't know whether he pointed it at Claycomb before that or not, do you?" A. No, sir."

Witness Bert Forsythe testified on behalf of the plaintiff in error as follows:

"Q. Did you see a little difficulty there between Mr. Tinker and Mr. Claycomb? A. Yes, sir. Q. Did you see it from the time it commenced until it was ended? A. Yes, sir. Q. State to the court and jury what you saw. A. The first I seen, I seen Mr. Nickum go to Mr. Tinker, and says, 'Mr. Tinker, he says, 'I'll go and see that you get a number, if you want one,' and Mr. Tinker says, 'If I want a number, I'll get it.' Mr. Nickum says, 'This is my house.' Mr. Tinker says, 'yes,' and he was at a public dance and had come to it, and Mr. Nickum says he wasn't at no public dance, and he says, 'This is my house, and I'll put you out,' and Mr. Tinker says, 'You look like 30 cents to me,' and kind of stepped toward him, and his sister run in and grabbed him, and says, 'He's got a gun.' I grabbed hold of his right hand, and Mr. Claycomb and Eli Landrith grabbed hold of his left hand and took the gun, I suppose. I never saw the gun, until Claycomb had it in his hand. Q. Did Mr. Tinker attempt to shoot Mr. Claycomb with a gun there? A. No. Q. Where you

were and had hold of him, if he had pointed the gun for the purpose of shooting, you would have seen it? A. Yes, sir. Q. Now, after they got the gun away from him, what did they then do? A. They took him out of doors then. Q. You say they had hold of him, and his sister had hold of him? A. Yes, sir."

And on cross-examination the following:

"Q. Did you see the gun when Mr. Claycomb came up there? A. No, sir. Q. The first you saw of that affray was after Mr. Claycomb had hold of Mr. Tinker's hand? A. I never seen the gun, until after Mr. Claycomb got it."

Witness Maggie Drummond, sister of plaintiff in error, testified as follows:

"Q. Were you there at the time the difficulty came up between Mr. Tinker and Mr. Claycomb? A. Yes, sir. Q. Were you there when it first came up? A. Yes, sir. Q. Tell the jury and court just how it happened. A. Well, he first wanted one of the first numbers, and they wouldn't let him have one of the first numbers, and they went on until they got up to 16 or 17, and then he couldn't take one of those numbers. Q. Tell about the trouble that came up there. A. Mr. Nickum went to Joe and asked him if he wanted a number, and he told him, 'no,' and told him if he wanted a number he would get it, and so Mr. Nickum said he would put him out, and he said, 'No; this is a public dance, and I am going to stay; that's all there is to it.' I grabbed him then, and told them he had a gun, and to take it away from him. Q. Had he made any attempt to use the gun? A. No, sir. Q. You knew he had a gun? A. Yes, sir. Q. What did you do about the gun after that? A. Mr. Claycomb asked me where the gun was, and I said, 'It is in his pocket.' He had never taken it out of his pocket, and when he went to take it my brother took the gun out of his pocket. Q. Did he ever point his gun at Mr. Claycomb? A. No, sir."

And on cross-examination the following:

"Q. Why did you tell him that he had the gun? A. Well, I didn't know but what he might use the gun. I knew he had the gun; that he had brought it with him. Q. Did you know why he brought the gun with him? A. No, sir. Q. Did you hear him cursing anybody? A. No, sir. Q. If he had, would you have heard it? A. I suppose I would; I was right there. Q. You are

5 Cr.—38

staying at your brother's house? A. Yes, sir. Q. And was at that time? A. Yes, sir."

Plaintiff in error, on direct examination, testified as follows:

"Q. Just tell the court and jury how this difficulty came up between you and Mr. Claycomb. A. Well, I went over there to the dance, and I went around to Mr. Claycomb and asked him if he was selling numbers and he said, 'No, I am not selling numbers to-night,' and I went off and stood around, and talked with some of the boys, and I guess went out of doors; I don't know; I guess I did; and I came back and he was selling numbers. I said, 'I thought you were not selling numbers.' I said, 'Give me the next number, if you are not too far ahead. I want on the first dance.' They were running two sets, and thought 8 would catch it. Anyway, it was 13 or 14. I said, 'Oh, no; I wouldn't have that. If I couldn't have something before that, I wouldn't care to dance.' And Mr. Nickum—I seen him pick up a chair from the north side of the house and carry it over to the east room, murmuring about something or other—I wasn't paying much attention to him; and after awhile he came, around and said, 'Joe, if you want a number, I'll get it for you.' I said, 'If I want a number, I guess I can get it myself,' and one word brought on another, until pretty soon my sister halloed, 'He's got a gun,' and grabbed me, and when she grabbed me I looked around to see who was coming. I didn't know what they were liable to do to me. I saw Mr. Nickum carrying the chair along, and then I don't know whether I halloed for anybody to get my gun, or not. Anyway, I didn't want them to get my gun. I had been quarreling with them quite a little bit. I seen Eli coming, and I reached and got my gun, and was holding it back of me. As far as holding it up in front of me, I never did. Q. Eli Landrith? A. Yes, sir. Q. Your object, then, in getting your gun, or taking hold of it, was to keep Claycomb and Nickum from getting it? A. Yes, sir. Q. Did you ever point the gun at Claycomb? A. No, sir."

Mrs. Tinker, wife of plaintiff in error, testified on direct examination, as follows:

"Q. Were you there when the little trouble came up between him and Mr. Claycomb? A. Yes, sir. Q. Did you see him attempt to shoot Mr. Claycomb there, at that time? A. No, sir."

And on cross-examination as follows:

"Q. Did you see Mr. Claycomb take the gun away from him? A. No, sir. Q. You weren't close enough to see that? A. I was standing right there by him. Q. Did you see the gun there? A. No."

The question in this case was a simple disputed issue of fact, and the issue was properly submitted to the jury by the court. The testimony in the record tends reasonably to support the finding of the jury, and will not be disturbed by this court. As a general rule this court does not undertake to review the testimony as far as its weight and credibility are concerned, but the record in this case sustains clearly the finding of the jury.

The other two questions urged in the brief are misconduct on the part of the jury, which prevented the plaintiff in error from having a fair and impartial trial, and that the jury received evidence outside of the court, other than that resulting from a view of the premises. These propositions are considered together in the brief, and we shall dispose of them together here. The motion for a new trial sets up that one of the jurors had formed and expressed an opinion in regard to the guilt of the defendant after he had been impaneled and sworn to try the cause, and before the same was finally submitted to the jury. Several witnesses were introduced in support of and in opposition to the motion. The testimony in the hearing covers several pages. The court, at the time the motion was passed upon, made the following findings:

"There is no testimony here that any person made any comment upon the case in the presence of any juror; and no evidence offered tending to show that the juror, or any of the jurors, were influenced in any way in arriving at their verdict by anything, other than the testimony that was offered in the case."

We think the finding of the court is sustained by the proof shown in the record. The defendant had a fair and impartial trial under the law.

The judgment is affirmed, with directions to the district court of Harper county to enforce its judgment and sentence.

FURMAN, PRESIDING JUDGE, and DOYLE, JUDGE, concur.